Case number 20-1388. California Public Utilities Commission petitioner versus Federal Energy Regulatory Commission. Ms. Mori for the petitioner, Ms. Rylander for the respondent. Ms. Mori, I'm also glad to see you. We've been trying all morning to find you, so that's okay. Please proceed. I apologize. Please proceed. I've been watching, so I don't know what happened, but thank you. Good morning, and may it please the court. I'm Candace Mori on behalf of petitioners. The California Public Utilities Commission asks the court today to remand the commission's order. The commission arbitrarily and capriciously approved a new filed rate formula that can overpay resources for backstop capacity without any safeguards to protect consumers or even other sellers in the market from windfall profits. It compelling concerns and contrary evidence that parties raised and based on nothing more than conclusory reasoning. To further explain the gravity of the commission's error and why the law requires remand, I'd like to present three arguments this morning. First, why preventing windfall profits is important to California rate payers whose interests the commission failed to advocate versus FERC compels the same outcome here, remand. And third, that remand is necessary to clear up this key question. What costs, if any, above our resources going forward costs should be guaranteed in the voluntary CPM capacity market, given that the ISO maintains mandatory backstop procurement power through its reliability must run tariff. Now, first, this case matters because the commission has failed to fulfill its core statutory duty to protect consumers. The words consumer, rate payer do not even appear in its order. The ISO pointed out to the commission that capacity markets are tightening in California. Parties submitted evidence that CPM, the capacity procurement mechanism at issue here, that those CPM solicitations have become structurally uncompetitive and that CPM sellers have market power. And that was before a prolonged extreme heat event in California caused reliability problems in the summer of 2020. In California, we have a history of sellers exerting market power to gain excessive compensation and harm rate payers. And the new rate makes this even easier. It streamlines the process to get commission approval to make offers above the competitive soft offer cap and guarantees them a 20% adder, whether they need it or not. The stage is set. I have just a basic question about the structure of this and why it matters, which is, I mean, usually a tariff price, it's just the price that the utility will charge. And if the consumer wants power, they have to pay that price and that's it. This case seems a little unusual. This is just about bidding options, right? And the above cap rate, on the one hand, it seems a little bit strange, but on the other hand, it only becomes relevant if that's the price for clearing the market. And if lower bids are not accepted, and it seems like the history under this program is, if I understand it, there's never been an above cap rate that's been the market clearing price. So if someone can make a bid at cost plus 500% and no one ever buys at that price, what are we arguing? Why does that matter? Well, the context here is important, as you know. In California, the primary market for procuring resource adequacy to make sure that we have enough capacity to meet our energy needs is through bilateral contracting. We have a bilateral resource adequacy as our first stop, you'd say, for buying capacity. And then in addition, the California ISO has two different options to procure backstop capacity. The first one is this capacity procurement mechanism. And so if there is a deficiency in the resource adequacy showings or an unexpected event, it can go to this market, the CPM solicitation, to buy that capacity. And the other one is a mandatory reliability must run program. So if resources are looking to mothball or shut down, then that's where they go to make sure they're getting enough cost recovery to stay in operations. And so getting back to your question, in CPM solicitations, in 2015, the ISO proposed changing this market from a fixed administrative price. So every resource would have been paid the same, one price. And it went to a competitive bid process. And now this is pay as bid. So there's not a market clearing price. Each resource that bids in, if it's needed, it gets the bid it which was part of a broad settlement that all parties agreed to, was that there needed to be a market mitigation measure there. And that market mitigation measure is that soft offer cap price. And so there's a formula that says this is the price that you get to bid up to with no justification of your costs. But what we're talking about today is bids above that soft offer cap price, where resources that are the highest cost, I need some more money. Yeah, I understand that. And I understand they get the bid price. But that's only if the ISO accepts that bid, right? That's correct. But this is a filed rate is the other important aspect of this. So this is a cost based showing that the resources make in order to be able to bid above that soft offer price. And it's important because whether it's been used much before in the past, it's really not a good predictor of the future here because the capacity markets are tightening in California. And when sellers have market power, it is not just unreasonable to pay them more than the costs they need to incur to pay to provide that cap capacity service. And now, the second point I want to make is that the court here is compelled to reach the same outcome, which is remand regarding this automatic 20% adder that it's giving resources, as in the recent decision authored by Judge Henderson, the Delaware Division of the Public Advocate before. And the case is so strikingly similar here to this one in the ways that the commission failed to engage in reason decision making. And before making that analogy, I'll just give you a quick recap here. Here, the ISO did not provide and the commission did not rely on any data or evidence showing that the CPM, the capacity procurement resources, need or will use this automatic 20% adder that's given on top of their demonstrated going forward costs. They did not show that those resources will use or even need that adder for maintenance and upgrades. And in the ISO's energy markets, another key point is these resources retain all of the energy markets that they earn. And those energy bids, they're allowed to recover long-term maintenance and upgrade costs. The Department of Market Monitoring, which is the independent market monitor, asked the ISO for this assessment and never provided it. And the commission never responded to this issue. It didn't say anything in response to arguments that resources are already earning enough money through market revenues in this competitive solicitation and that it's just windfall profits to give them this extra 20% booster. The commission simply concluded that the inclusion of a 20% adder on top of demonstrated going forward costs is consistent with commission precedent on CPM compensation. And now if this all sounds really familiar, this failure to engage in reasoned decision-making, it should, because it was the same flaws, the commission, the same failures of the commission in reasoned decision-making in the Delaware Division of the Public Advocates versus FERC case. And now before I conclude, I want to make one final point today. The commission has never answered this looming and critical question, which is just fundamental to this competitive solicitation. And again, this is a voluntary backstop capacity market. And it's never said, well, what costs, if any, should these resources be guaranteed to recover in addition to keeping their market revenues and in addition to a capacity payment that covers their actual and demonstrated going forward costs. And this is critical in 2020 right now because of recent reforms that the ISO has made to better distinguish this voluntary and competitive backstop market from the ongoing mandatory reliability must run program. And it's not even clear that the ISO itself agrees what additional fixed costs this capacity price should pay for. And this clarity is critical because California's new rule does not follow the guidelines and directives that the commission has given in the New York ISO in two orders where it addressed this very same issue about payments in a voluntary backstop capacity market. And now to look back at what guidance the commission has given on CPM compensation in California, we wind back through its 2015 CPM order to the 2011 CPM order. In that order, the commission rejected a proposal the ISO submitted. We don't think that compels any particular outcome here because again, California's resource adequacy program, which provides most of capacity and the ISO's market rules have evolved significantly since 2011. But in that order, the commission expressly identified long-term maintenance and other improvements such as environmental upgrades as the type of money it wanted to make sure CPM resources could recover. And now I just want to leave the court at JA21 here before I go. In its own transmittal letter and answer, the ISO itself said that it is not just unreasonable to pay capacity procurement mechanism resources for their actual long-term costs and upgrades. It says the reliability must run mechanism is much better suited than this voluntary backstop market to address the recovery of long-term maintenance and upgrade costs that may be needed. And in its own words, the ISO said these kinds of costs could be millions and millions of dollars, and it asked if they should even be accommodated under the CPM framework. Now I'm not sure how it can be unreasonable to pay a resource for long-term maintenance costs it actually incurs, but then reasonable to pay them for these same kinds of costs only so long as they are unknown, approximate, and not necessarily incurred. And the ISO never explained that. And so it is critical to make sure. And one other thing is the ISO also identified that there are no provisions to prevent resources from going back and forth between this market rate that's supposed to be competitive and the filed rate that they're going to get approval from FERCON with a 20% adder. But this clarity is needed and remand is needed for the commission to make sure that this new rule is passed in California is consistent with its policies and other ISOs. Now if there are no other questions then I will reserve the remainder of my time for a rebuttal. All right, we'll hear then from Ms. Rylander. Good morning. May it please the court Elizabeth Rylander for the commission. What's required of the commission in response to a Federal Power Act Section 205 rate application like this one is it uses technical understanding and policy judgment to evaluate whether that rate's just and reasonable. California Commission's challenge here is that policy judgment which has been developed over many years of evaluating proposals for the California ISO as to how best to procure capacity in its region and how best to balance the various mechanisms for obtaining that capacity. As Ms. Mori has noted the capacity markets and the energy markets are not the same and the compensation mechanism here applies just to what is necessary to entice resources to be that arises from providing that energy. So the capacity payment has to be sufficient to bring generators into the market no matter what happens after that. Excuse me, the energy market you're referring to then is the consumer's payment of the monthly electric bill? Your Honor, that would be a retail level bill that is not subject to the commission's jurisdiction. Once the capacity is brought online through these incentive payments basically, then the owner of the capacity generates and keeps the revenues from the first sale of the energy as well as whatever it's gotten from for bringing the capacity online. Yes, Your Honor. Okay, got it. Thank you. So what's the issue here? So just I had the same question. This capacity is a kind of option contract. Right? Yes, I think that's a fair question. Is it fair? Am I thinking about things in the right way to think of these payments we're talking about is just the price of buying the option as opposed to the strike price, correct? Yes, Your Honor. Okay. And this court has considered a number of cases at a number of regions in previous years of California and elsewhere concerning capacity markets, how they work and what their function is. And just one other nuts and bolts question before you get into the guts of your argument, which is with that in mind, what is the conceptual difference between going forward costs, which you generally think could be compensated as part of the option price and all other costs, which we were talking about the underlying cost of providing the service you would think the provider should recover all of its costs. What's the difference? What distinguishes going forward costs in this context? Going forward costs are a narrower set of costs than full fixed costs. And in this case, I believe there can be more than one definition of going forward costs, but here it's just narrow categories. Yeah, I get that. I have in my notes, it's fixed operating and maintenance costs, ad valorem taxes, and insurance costs. I understand the point that that's a proper subset. I don't understand what the economic or practical significance is between those costs and other costs that aren't included in this option price. I would characterize it as short-term costs versus long-term costs. And the commission's orders also draw this distinction in a couple of places, I believe in 2011 and 2015. What the commission found is necessary in this case is to provide an incentive not just for capacity providers to enter the market to provide capacity, but also if there is a resource that is maybe not very economic and that is at risk of retirement, there needs to be some incentive to remain in the market. There you get to longer term costs such as maintenance, long-term maintenance and capital improvements, which are referenced in the orders. Okay. So then can I ask you, so the 20% adder, which is a structural feature of this, what is that designed to do? I could think of three possible reasons for having an adder. One is to account for the fact that there are costs that aren't going forward costs. One is to account for the fact that you want a reasonable rate of return above and beyond costs. And the third, which I think is what's going on here, but I want to make sure, is to account for the fact that if you just pay average costs, if what you're trying to do is compensate going forward costs and you just pay an average, that won't be adequate for high cost producers on the right-hand side of the bell curve. And the 20% is designed to account for that. Yes, Your Honor. Paragraph 36 of the order on review discusses this somewhat in explaining that the 20% adder is intended to provide for sufficient recovery of fixed costs, which is the broader category Your Honor was asking about earlier, plus a return on capital to facilitate incremental upgrades and improvements by resources, which as I mentioned earlier would encourage them or provide them an opportunity to remain available in the California markets longer if they choose to. Sorry, I'm just talking about for now 20% adder in the soft offer cap. Oh, I'm sorry, Your Honor. And I understood that one to be primarily about the last thing I mentioned, which is you're trying, your objective is to that will do that for high cost producers. Yes, I agree with you. Sorry, go ahead. Okay. The going forward costs reflected in the soft offer cap calculation are those of a reference unit, not a specific unit. And there will be some specific units whose total bid is less than the reference unit. There will be some with costs that are lower. So the 20% provides a cushion to make sure that they're all compensated. So if that's right, why isn't CPUC's criticism of FERC's reasoning spot on, which is the only discernible reasoning in the order is, well, we have a 20% adder there, so we can have a 20% adder here. But the 20% adder in the above cap rate, I mean, if the logic for the 20% adder in the default cap is we need to accommodate high cost producers who are on the right-hand side of that bell curve, then if you start with such a high cost producer, and then instead of giving him average plus 20, you give him actual cost, I mean, that would seem to obviate the need for another 20% on top of that. No, Your Honor. It does not obviate the need for additional revenues because, again, the above cap compensation is based just on going forward costs, not on full fixed costs. The Commission has previously evaluated the question of paying only going forward costs, as discussed on pages 32 and 33 of our briefs, as to findings in other regional systems. And here, specifically in the 2018 order on paragraph 44, where the Commission noted that a resource at risk of retirement, which is the type you tend to see in the capacity procurement mechanism, is likely to need more than compensation available bilaterally. And what is available bilaterally, because that's a competitive function, is going to be somewhat lower than what is available in the capacity procurement mechanism. So it's designed to capture the difference between going forward costs and other costs? Yes, Your Honor. What the Commission is trying to do here is to identify a rate that is within the zone of reasonableness. It just seems like, I mean, what do you do, what about an average cost producer who can't say, well, I need more to account for the fact that my going forward costs are high? Or even a low cost producer, are they allowed to go above cap on the theory, not that they're going forward costs are higher, but that they need to be compensated for other costs that aren't going forward costs? A resource that's bidding above the offer cap would have to submit a cost justification filing to the Commission. And as we've been over already, first, that offer would have to be accepted. And there has never been an above cap offer accepted. And there's never been such a justification made to the Commission. So to answer your question, I think a lower price generator could try to do that. But first, the two huge obstacles would be having its bid accepted and then having the Commission find that the bid is justified and that the ISO could pay it. Getting back for a moment to the need to just... Excuse me, you said there's been an above cap offer accepted? Yes. So when they... Above the soft cap. Yes, above the soft cap. There has never been, to my knowledge, since the soft offer cap was was implemented in 2015, a bid higher than the soft offer cap accepted for use in the California ISO markets or a cost justification filing made to the Commission. So this rate is... Have bids submitted but not accepted? I don't know, Your Honor. Okay. So most of what we're talking about relates to bids that are above cap, none of which have ever been accepted but might be in the future. Correct. So this is all very theoretical. But the 20% adder, if I understand it right, below cap bidders don't submit their costs, right? So the adder's intended for them to account to the variability in cost that you described, variability from the reference source. Yes. But above cap do submit their costs. Yes. So the justification from the below cost context doesn't seem to carry over. What's the need for an adder once you've gotten actual costs demonstrated? Once again, Your Honor, the... You're going to say because the costs that are demonstrated are less than the full fixed costs, right? Yes. So... And there's been a great... Why is it reasonable to do that rather than ask for a showing of the full fixed costs at the same time as the going forward costs are submitted? There's nothing in the record to suggest whether that's reasonable or not, because that is not the proposal made to the Commission. The proposal made to the Commission was... I should say, that justifies the 20% adder other than carrying it over from this other context for below cost, below cap offers. There are a couple of guideposts in the Commission's past decisions and also reflected in the record here. There is agreement among market participants that the current rate for above cap resources is too high. And that's noted in the order of paragraph 12 and also at paragraph 35 and 36. What's too high? The current rate... I'm sorry. I should say the previous rate that was in place from 2015 until this order. Right. The ISO wanted to replace that rate because market participants felt that it was too high. The Commission did not make a finding as to whether that rate had become unjust and unreasonable, but accepted the party's interest in changing it. So those are purchasers, I gather. They're complaining about the rate. There were purchasers and state entities complaining about the rate, yes. And on the other hand, Atticus Alpine says it's too low. Wait a minute. That was the rate for what? Above cap? Yes, that was the rate for above cap. It was calculated using a different mechanism. That was calculated using full fixed costs plus a return of an on capital that was previously set at 12.25%. So they thought it was too high for rate for bids above the cap, none of which has ever been accepted. Correct. Got it. Ms. Rylander, may I ask you about paragraph 5 in the FERC dissent by now Chairman Glick? That last sentence about, well, he says first the 20% adder is particularly troubling because the CPM resources retain all market revenues earned and so forth. Then he says especially given the evidence of market power in the CPM process, the commission ought to provide some reason to believe that the 20% adder will be anything other than a windfall for high cost generators before finding it just and reasonable. What about this evidence of market power in the CPM process? Your Honor, the commission in paragraph 41 of its order limited the scope of this case just to the rate proposal. And it chose not to take up the issues of how the capacity procurement mechanism as a whole was working. The ISO will have to revisit the capacity, I'm sorry, will have to revisit this particular rate starting as soon as next year. I would mention though that the petitioner here, the 2020 has never been used, will be reexamined next year in the ordinary course. The California ISO tariff requires that every time the California Energy Commission releases a new study of generator costs, the California ISO in its stakeholder process must review the soft offer cap and it's working. And if the California ISO wishes to make changes, then it has to submit those to the commission. The tariff provision is cited in the commission's order. I believe it's footnote 9, 43A.4.1.1.1. And it is appended to the back of the petitioner's brief. But where is that in the order, in the JA, joint appendix? In the JA, it is page 255. Give me a moment here. I have it. What footnote? 9. Also paragraph 5, Your Honor, explains that the ISO's tariff requires it to conduct a stakeholder process to revisit the soft offer cap at least every four years. And that, which is seen in the tariff provision, that is tied to the release of regular California Energy Commission reports. So is there some reason to think that the question of market power will be investigated at that point? It hasn't been in the past, I guess. I can't say, Your Honor. Well, I think that, I think Judge Ginsburg is asking the same thing I asked originally. In other words, the dissent says, you haven't considered the market power of the CPM regime. And you pointed to the majority or the order from FERP saying, we're not going to do that now. That's their, I mean, they don't explain why they aren't. They're just not going to do it now. And then Judge Ginsburg, I think you answered him saying, they may never do it. Am I right? I can't speculate on what will happen in a future commission proceeding that hasn't begun at this point, Your Honor. I would certainly expect that if there are market power problems, they will be brought to the commission's attention, either by a complaint or in future capacity procurement mechanism rate cases. This is not a filing that deals with the overall structure of the capacity procurement mechanism or the way it works or how the California ISO uses it. It's limited to the very narrow issue of compensation for a small set of resources. And once again, it's never, you know, for the hypothetical, so far, hypothetical situation in which such payments are necessary. But if the justification, you're right, what's before FERC is a tariff amendment limited to above cap offers. But if FERC's justification is, well, this seems okay because the formulas appears analogous to what happens for below cap offers, which seem not a helpful fact for you, that if FERC has not examined at all what happens, the reasonableness of the below cap offers. Your Honor, I think we got away from this issue a few minutes ago, and I would like to re-explain that the commission was not merely looking at the level of below cap compensation and saying, well, that worked in 2015, that'll probably work now. It does have other precedent in other cases concerning this and other ISOs in which it's found that going forward costs alone, which is the pinpoint rate the California commission would like to substitute here, are too low. That's in our brief at 32 to 33 and also described in the 2018 order. And there's also evidence of the record that the current rate for above cap resources, which is full fixed costs plus a return of it on capital, is too high. That's mentioned in the order of paragraphs 12 and 35 to 36. And even Commissioner Glick said that this rate is at least a step in the right direction. I'm sorry, I misspoke. What the California commission, which never mentioned windfall profits, I believe until its reply brief, would like us to do is to substitute a pinpoint rate that the commission knows is not sufficient to compensate expensive resources. For something that appears to the commission to at least be in the range of just and reasonable and which will remain under the commission's oversight in the future. How do they know that it's insufficient if they have no experience with actual bidding on it? What the commission has found in the past, Your Honor, is that going forward costs with which it does have experience alone are insufficient. I'm sorry, can you repeat that, please? Under the 2020 order, the going forward fixed costs are actually shown. They're demonstrated at some point to prove what the actual number is. For, yes, for a below cap resource, the going forward costs of the reference rate are demonstrated, the reference unit are demonstrated, and for an above cap resource, the going forward costs of the specific unit are demonstrated. Right, so they get their going forward costs and they get fixed operating and maintenance expenses and taxes, right? Taxes, insurance, and so on. Yes. Then they get the adder. Yes. Top of that. And they have market revenues. Yes, but we must presume, Judge Henderson, we cannot assume anything about market revenues because it is not necessarily the case that a unit whose capacity bid is acceptable and that is available in the capacity market will ever be called upon to provide energy. Two recent cases concerning just this situation that we did not cite in our brief. Our Duke Energy VFERC, 892F3R416, and Old Dominion VFERC, 892F3R1223, those both concern capacity resources in a different system that lost money because while they were paid to be available, they were prepared and they purchased fuel in order to run, very expensive fuel in order to run, and then were not called upon to run. So market revenues, while market revenues are more complicated, that it is a more complicated concept than just simply assuming some positive number, which I think is what the California Commission is doing here. We really can't consider them. Seems that, therefore, this segregation that you have between the capacity market and the if the end result of the two is a windfall profit, that's really not our business. It's none of our business. That doesn't make the rate unreasonable. I do not expect that FERC, whose mission is to ensure just and reasonable rates, would ever countenance windfall profits, Your Honor. And that's what we know. How will one know, given the 20% ad or without any demonstration of the other, beyond the going forward costs? We will have real world data if this ever occurs. And if it does, the Commission has tools at its disposal to change the rate in the form of Federal Power Act Section 206, or to further investigate the rate or otherwise to make changes. What we don't have is any showing that there will definitely be windfall profits or anything of that nature. And in the capacity market, do you regard market power as essentially irrelevant because when this capacity is called upon, it's an unusual and urgent situation in which demand is, the price offered is very high. The market clearing price, let's say, is very high because of the basically urgent circumstances. And therefore, whatever it takes is reasonable. Um, I think that is reading more into the Commission's order than is there, Your Honor. But what is, again, the vast bulk of the capacity procurement mechanism is bilateral and is competitive and is intended to find some sort of clearing price may not be the right term, but is intended to find a competitive price for capacity. Right. And I think we'll find out more in rebuttal, but it seems to me the, the California Commission's complaint is analogous to saying, um, where there is a price, so-called price gouging because of the urgency of the matter. Um, the result will be higher than just in reasonable rates. I would say that is their concern, Your Honor. Yes. And of course, there will only be actual transactions when there is this great urgency and very high rates for bringing capacity online or keeping it. I presume so, Your Honor. Yes. All right. Thank you. All right. Judge Cassis, do you have any more questions? Nothing further. All right. Uh, Ms. Moy, why don't you take two minutes and also answer any questions? Thank you, Your Honor. Now, I have to correct several things that Ms. Rylander said about this tariff that are simply wrong. First, she said that, um, going forward costs alone, that the commission has found those to be not sufficient payments in a voluntary backstop capacity market. Now that is contrary to the commission's orders that it issued in the New Year. That's the minimum that needs to be paid. And that's because, as Judge Cassis said and hit it, hit the nail right on the point, um, paying the actual going forward costs of the resource obviates the need for additional revenues. And the commission just repeatedly flips the burden of proof in this case. The burden of proof is not on the commission to demonstrate that market revenues are not sufficient. The burden is on the commission to demonstrate that the adder is just unreasonable and not going to result in windfall profits, has no data, no evidence, no analysis whatsoever of how market revenues supplement the CPM earnings. And the Department of Market Monitoring, Pacific Gas and Electric, and CPC all put in evidence showing the market revenues are enough and asked the commission and the ISO to do an assessment. And it has never done that. It's second thing she said incorrectly is that risk of retirement resources are the types of capacity you're likely to see in this CPM market. Now that is incorrect. Risk of retirement designations are no longer available in this backstop market. That was approved in 2011. The ISO asked to add a risk retirement designation. And in just last year, the commission approved a comprehensive set of reforms the ISO has been pursuing to move the risk of retirement designation into its mandatory reliability must run backstop program. And that's where the ISO says itself, resources can and should go to get recovery of additional costs above their fixed costs if they need them to stay in service. And then, you know, finally, I just want to point out, she also suggested that the commission could correct a rate or deny a rate if in a section 205 filing, it turns out to show that it's unjust and unreasonable that it's too high. And I don't want to put words into my opponent's future opponent's mouths. But I am very certain that if the CPC showed up in one of these proceedings and said, no, you can't give them this 20% adder, the rate is too high, this resource doesn't need it, that would be deemed a collateral attack on the commission's order here, because it's approving the automatic inclusion of the adder, whether the resource needs it or not, there's no demonstration required, the resource doesn't even need to claim that it will use the money for anything other than And now, Judge Henderson, you asked me to answer a question, I want to make sure I address that. If you can repeat, oh, no, no, I just said answer any questions we have, I don't have any. Okay, well, then I just I just want to also make one point in closing. Hold on a second. So you're saying if the FERC initiated a proceeding to to investigate or correct reject these filed rates as being unreasonably high, that would be barred as a collateral attack? No, Your Honor, what I'm saying is, in its brief, the commission has pointed to this process where to go above this soft offer cap, a resource has to make a section 205 filing with the commission, it shows what its actual going forward costs are. And that's where the commission gives that filed rate. And Ms. Rylander has suggested in her answer today that the commission could correct that rate there, if it looks like that's going to be too high for resource. And what I'm saying is that's incorrect, because the commission's order here guarantees the extra 20% automatically. And so if the CPC tried to oppose that, it could be deemed a collateral attack. Oh, if you tried to oppose it, I see. Okay. Right. And then always after the fact, you know, if things go haywire. Let me just make sure I got that you're saying that in the later the later proceeding would adjudicate the question of what the actual going forward costs were, it could not relitigate the question of whatever that is, you get that plus 20% more. That would certainly be an argument parties would make. And, and it's significant. Excuse me, would they be invoking the files rate doctrine? Is that what would happen? I think it would be a collateral attack, because here the commission is approving a new method. And it's part of a comprehensive set of reforms. And the intention was to streamline and simplify this process. So while resources may have never actually gotten authority to use an above cap price before, the whole intention of this is to make it a shorter form, it's a much, it's only four categories of costs instead of around 20. And they get that automatic 20% adder. It's it's not the same as fully litigating what the cost of service is for the resource. That's the change the commission is making to the above cap rate. And it's making that change because resources can always get their full cost of service by going through the California ISO's mandatory capacity backstop program, that's the reliability must run program, if they are needed to stay in operation for reliability. That's not a choice that the resource owner can make. That's a choice that the ISO makes. No, the resource owner can make that choice. And the ISO can say, I, how can the resource say, you must, it's, it's mandatory, you must buy my capacity. If the resource is saying that it's not making enough money from the market revenues, and that it's actually going to have to shut down or mothball, it goes to the ISO. And it says, you know, we're planning to de-issue. And then the ISO, if that resource is needed for reliability, it will evaluate what long-term costs, upgrades, cost of service is needed by that resource to keep it in service. But here, this capacity procurement mechanism is a short-term market. The ISO itself pointed out, these are usually one to two month designations. Many of them are for partial units. And the ISO itself, I really invite you to look at JA-21. The ISO itself says, this is not the to provide long-term costs for environmental and other upgrades. It says that should be done in the reliability must run program. And so again, the commission here has said, well, there's no, there's no evidence that the 20% will overcompensate, but that's not the burden. The commission's order has to be supported by substantial evidence. In this case, it is not close to a scintilla. It is zero. The only basis for its decision is that, well, we approve this 20% adder for the soft offer cap itself in connection with proxy resource. So we'll approve it here. And just one other thing to point out, the ISO revisits this price every so often. In the reform, in the stakeholder process that was just finished, the parties demonstrated that soft offer cap price is too high, that the CPM solicitations have become structurally uncompetitive and parties asked the ISO to lower it, but it didn't do that. In the section 205 filing, it only recommended changing the above soft offer cap. So if we're going to get that soft offer cap change, we have to file a section 206 complaint. But that's not part of your, your concern in the current proceeding, right? In this court, you haven't challenged that. We, that is not before the court because it would have to come through a section 206 complaint, but those very same concerns, the very same evidence showing that that soft offer cap formula itself with the 20% adder has become overcompensatory, that is leading to unjust and unreasonable rates, and that there's market power being exerted in California today. That, those same arguments compel the commission to do more than it has done here. It is not balancing the interests of consumers against the needs of sellers and it is required to do. It hasn't considered consumers at all. Only now Chairman Glick has done that in his dissent and he reaches the right outcome here. All right. Are there any more questions? All right. Thank you.
judges: Henderson, Katsas, Ginsburg